Court of Appeals for the Federal Circuit is now open and in session. God save the United States Court of Appeals for the Federal Circuit is now open and in session. In January 1995, the Corps of Engineers raised the water level in Poole 3 in Paris, Louisiana from 87 foot to 95 foot. The history bringing about that occurrence is set forth in the record and I'll not go into details of that unless the court wishes. But let me point out the locking dam number 3 which controls Poole 3 was modified to accommodate this event and is the only dam on the entire waterway that has a hinge system. So that become necessary as a result of the background effects that were developed in the history of why this occurred. The Corps indeed had bought their rights away and the property owners received fair and good compensation for a water level depth of MSL of 87 foot within the Poole 3 area. The problem arose about a year after the raising of the level of the Poole. Various land owners and property owners and ranchers began complaining that this raising of the Poole had increased damages that were unexpected and unadvised. Excuse me, but it seems to me that all of the arguments presented in your brief lay out the facts in some detail and with great clarity. Yes, sir. But the question that seems before us is one of causation. Yes, sir. It seems all centered around whether those facts establish causation and in particular before us whether there was a clearly erroneous finding that warrants overturning the decision by the court of federal claims. And one of your briefs clearly outlined all of the facts. They didn't really point out where the errors lie and where there were clear errors in the court of federal claims determination of lack of causation. All right, if I may address that, Judge Manley. The history indicated that the navigation creation of the Red River Waterway was originally established to be 87 foot and indicated it was raised to 95 foot. The expert offered by the defendant, Dr. Harvey, as you indicated, testified based on his expertise that there was no causation relating to these losses. We would ask the court to recognize these points for whatever value you may attribute. Dr. Harvey is a long time agent for the court. He had done a tremendous amount of work for the court. At the time of trial, he was in Denver, Colorado or nearby. He had been paid over $3 million by the Corps of Engineers. Didn't know how much he was going to be paid for this case at the time of the trial. He had always testified for the court. He always found for the court and never against the court. We believe that's relevant for your consideration from the standpoint of evaluating his opinion as it relates to no causation versus that of Mr. Alan Cox, our expert. Mr. Alan Cox was a retired chief hydrologist for the Department of Transportation in the state of Louisiana and retired from that job. He had been contracting with the court for several years after retirement. He was familiar with this process. And Mr. Cox, having studied it carefully, disagreed with Dr. Harvey in that causation did in fact occur causing damages to these property owners. Let me tell you, Dr. Harvey testified regarding causation that there was no possible way that the major tributary by a pier in North Natchez Parish could contain water which backed up away from the river. But, Your Honor, the facts in the case clearly show otherwise. If you will recall, the judge directed that the plaintiff testify by way of affidavit. She indicated to everyone that the court attorneys were authorized to cross-examine each of the plaintiffs or offer counter-affidavits. Neither did they offer any counter-affidavits and did not cross the plaintiffs at trial. The judge had indicated if indeed that occurs, then it's presumed the statements of fact contained in those affidavits are correct. We believe that stands before the court, Your Honor, unrefuted by the court. They did not call one witness except their experts to testify as to causation. We called not only Mr. Cox, but all of our landowners and other experts with regards to causation. There are two gap cause of crimes. One is the water overflow. Regarding the water overflow, three of the property owners live on or near a bio-pier which feeds directly into that river. Mortgage right on the river. Pace is a little off the bio-pier and Hayden is right on the bio-pier, not far from the river. Dr. Pace had complained significantly about water overflow coming from this project onto his land. In fact, it contains a picture of his house, if you recall. That's two thirds under water. Dr. Pace wrote his congressman. The congressman wrote to Cohen. The chief engineer for the district wrote a letter in evidence to the congressman which was sent to Dr. Pace. We offered him evidence. Indicating that subsequent studies following the raising of that pool level shows that one, there is an increased frequency and overflow to those landowners. Two, it's more severe in that more lands are involved. Three, there is a longer duration for the water to stand on those lands that are adversely impacted. And four, and that's significant too, is that the flow of the water in Red River by cubic feet increased significantly after the raising up to the 95 MSL. Regarding causation, again Judge Lamb, we have photographs, testimony of eyewitnesses that lived on, watched and saw the water back up bio-pier from high conditions of Red River. Conditions that did not exist prior to the raising of that pool. We believe there's affirmative evidence clearly indicating that and supported by the chief colonel in charge of the district in this letter I just identified which was filed in evidence. Regarding the groundwater claims, they're distinctly different. The predominant groundwater claim is that asserted by Mr. Ingram. He's located substantially south down the river from the bio-pier area. The trial judge, again as to causation, relied upon Ms. Hathaway, the court expert, who was unfamiliar with the Red River project, who was familiar with Dr. Harger. Dr. Harger had recommended her and had worked with her in the past. She did make one significant statement. The water of Red River and the water out of the groundwater marries up together at a point in time, at a point in place. She acknowledged that occurred. The judge indicated that any property owner within a distance of one mile from the river in her written readings should have a groundwater claim if proven in causation. With regards to Mr. Ingram, you had a report in 1965 of a firm engaged in the Petty John report, if you've noticed in the record, that predicted this would occur, Your Honor. You had a subsequent study in 1995, October, by the geotechnical services, who came on site, Judge Mann, studied the property, looked at it, and said, if you indeed have groundwater problems, then it comes from this Red River level. Obviously, if common sense would tell you, if you raise the level eight foot, the migration of the water away from the river is going to be affected. In this case, it was affected in the dirt pit at 96 foot. Mr. Cruz, based on what you're saying, I gather that you didn't try and distinguish those plaintiffs who were closer to the river and those who were, for example, two or more miles away. Mr. Ingram, Your Honor, it's a good question. He's located between 500 and 600 yards from the near edge of the river. So, he's just right there on the river. But don't the plaintiffs include charges of flooding two miles from the river? The plaintiffs contend, based upon the testimony of Mr. Cox, based upon the Pentagon report, based upon the study of the geotechnical services, based upon an examination by the Corps engineers themselves that was conducted at the request of the Chairman or Executive Director of the Waterway Commission, Mr. Ken Hedrick. Based upon all of those facts, Your Honor, it was concluded that this was going to occur and did occur and was directly attributed to the raising of the pool level. This operation had been in effect a year before the pool was raised. No adverse water conditions had developed, water table-wise, in that pit, Your Honor, until the year after it was raised. So, the experts involved concluded, obviously, that was coming from the Red River migration. Didn't they attribute it to heavy rainfall in that period? There is some contention with regards to rainfall, but Your Honor, you had rainfall before this event and none of these problems were existent prior to the raising of the pool. There had been rainfall all along. There had been floods all along, but as indicated by the Colonel from the Corps of Engineers, this condition aggravated or exacerbated those conditions, as I have indicated, by way of more rainfall floods, more overflow floods, longer duration of water on the land, and a significantly increased damage as a result of those sort of conditions, Your Honor. So, with regards to the groundwater claims of Mr. Ingram, incidentally, Your Honor, that property is located eight miles south of Granby Corps. Granby Corps, if you recall from the record, is the gauge point the people used for the Corps to determine the measurements because that's where the gauge is at Granby Corps. That is inaccurate as it relates to property south of there, Your Honor, because the river level changes appreciably as you go downriver. So, those readings are inaccurate as they relate to the commercial dirt pit of Mr. Ingram. Secondly, Judge, Mr. Ingram had a 100-acre track contiguous to this also 5 or 600 yards from the river. The Corps came in there with the Red River Waterway Commission and said, you know, raising this water level obviously has caused more flooding and overflow of your land here. They examined that, studied that, concluded as to causation, Judge Lambert, and bought and paid for that 100 acres after their suit was signed. Regarding groundwater claims, the Red River Waterway Commission, at the instance of the Corps, had been investigating, acknowledging, had the Corps come over and investigate and acknowledge that these were groundwater claims and they were just and rightly due from the raising of the poo. Some of them had been paid for before the suit was signed. Others were under negotiation, including Mr. Ingram at the time of the trial, Your Honor. But when I filed the lawsuit, the lawyers told me that people don't communicate with the property owners anymore and don't discuss anything with them. With regards to the testimony, I would ask you all to please carefully read the testimony of Mr. Ken Gidry, Executive Director of the Red River Waterway Commission, a very knowledgeable fellow. The Corps and lawyers for the Red River did everything they could to impede my discovery regarding Mr. Gidry. And they objected to his appearing and testifying in the trial. But we finally accomplished that and his testimony was honest and set forth and correct. He talked about the distance of migration from the river as a result of raising the poo. He talked about hiring the geotechnical services, gentlemen, with regards to causation. Is this groundwater cause for the raising of that? I found that an affirmative answer. He, after discussing with the Corps, undertook their own independent examination. And if you've read the geotechnical services of October 1995, you see that that's very well confirmed and, again, those acknowledged damages. So we believe, Your Honor, Judge Lynn, that we have proven by way of causation with regards to the taking claims of these folks based upon the events that I've just indicated. With regards to causation, I thought of that again more or less now, obviously. If you remand this and let us put on the damages, it is the right and just thing to do from the standpoint of the property owner's claim. They've got to show their causation, Judge Lynn, by way of the damages. That's inherited. It's basic, fundamental in proving their claims that they are certain. I think they can do it. Maybe some of them don't. If they don't, then they fall on the issue of causation. Well, of course, the question is not necessarily whether they were damaged or whether there's been water elevation problems or water runoff problems. The question is what are those problems attributed to, whether they're attributed to the Corps of Engineers' activity or whether they're attributed to natural weather phenomena or other things. That's a very salient question. But if you read the affidavits of the landowners, who I respectfully suggest stand before you as unrefuted evidence, they affirmatively set forth causation, as does Mr. Cox, and as does the other experts, and as does Ken Giddy. I believe the totality of that would clearly meet the burden of causation as it relates to the issue of liability. Let's hear from the Governor and we'll tell you as soon as we have time. Good afternoon, Your Honors. May it please the Court. Katie Kovacs for the United States. The Court of Federal Claims, in this case, conducted a trial, issued a rather comprehensive opinion, finding that the Red River Navigation Project did not cause the flooding and groundwater problems at the plaintiff's properties. Those findings are findings of fact that, as the Court has already recognized and reviewed for clear error. The appellant's brief on appeal fell far short of meeting that standard. There are bold statements of… What troubles me, and certainly there was some acknowledgement and payment and so on. You raise the pool level by seven feet. Something is bound to happen. Well, yes, and that's the first point I'd like to make as a point of fact. Pool three, as the trial court found, the parties actually stipulated to all of these background facts. They're in the court's opinion. Pool three is at 95 feet, mean sea level. The Red River Waterway Commission condemned flowage easements up to 98 feet, so actually three feet higher than the pool level. They called that extra three feet freeboard. I'm not sure where that term comes from, but they actually condemned part of Mr. Ingram's property, too, anticipating that, of course, when you raise the water level, there will be overflow. The debate in this case is additional flooding above that 98 feet, which the court, through the Red River Waterway Commission, already condemned. But then how can there be a question as to causation? There might be a question as to the additional damage or the additional injury. But it seems to me the fact that this is flooding from raising the level, I shouldn't say flooding, this results from raising the level, is agreed by everybody. There's no debate that when you raise the pool level to 95 feet, the water will be at 95 feet. What the court found, based on, with all due respect to Mr. Cruz, uncontradicted expert testimony from the government, was that the project did not cause flooding at the plaintiff's properties, and it didn't cause ground level... There's four different kinds of claims, and perhaps I should break them down. The plaintiffs are in varying degrees, varying altitudes, but are they all positional or nothing? Or as Mr. Cruz has said, it's a matter of individual damages as to how much each plaintiff might have been injured. Those two miles from the river perhaps have a weaker case. Actually, the trial court found it was all or nothing, that it simply was not the project that was causing their problem. So maybe I can break down the four different kinds of claims for the court. The first kind of claim we had is flooding claim. And this is relevant to Gahagan, Morgan, and Pace, but not to Mr. Ingram. The trial court found that the project did not exacerbate flooding on their properties. Now, the plaintiffs did not present any expert testimony with regard to flooding. Mr. Cox testified only as to groundwater levels. He didn't testify on flooding. So the trial court found persuasive the testimony of the government's expert, who was the only expert on flooding. What kind of experts? If someone says, I hadn't had a flood in 25 years, and now I have three floods a year, and nobody says otherwise, what kind of expert testimony is it required? First of all, Dr. Harvey did contradict that. He didn't dispute that there was more flooding after the project. But what he found was that, and what the trial court found, as a matter of fact, again, reviewed for clear error, is that the additional flooding was simply due to more rain, in all likelihood. And actually, Dr. Harvey, his studies found that the project, as was intended, had actually improved flood control in the area. So it was simply rainier after the project. This is a wet area. So nobody's debating that there was flooding on the plaintiff's property. It simply wasn't caused by the project. And very significantly... How could it improve flood control? You mean it would have been worse? Yes, significantly. And the way it improved flood control... Is that in the record? Oh, yes, it's in the court's findings, actually. The court found this as a matter of fact. Can I ask if there's evidence? Oh, of course there's evidence. Yes, Dr. Harvey testified to this. The evidence is Dr. Harvey's opinion, right? Well, it was his uncontradicted scientific conclusion, which the court found persuasive. Again, there was no other expert on this point. And the way that the project was intended, was designed, and actually did improve flood control, was by straightening the channel. This river used to have a lot of meanders and oxbows. And the project cut off some of those oxbows. And in so doing, it actually steepened the river. So after the project, you can have the same volume of water passing through the river, and it actually rises to a lower level than it would before the project. So if you had 100 CFS before the project, it might have been up here. More water would be at a higher level. Well, no, after the project, more water is at a lower level because it's flowing faster. So the project, in that way, actually improved flood control and reduced the impact of floods in this area. And again, that was uncontradicted. So you don't really know? You don't know if more water is flowing or not? Well, there was, again, Dr. Harvey did extensive studies on this. The plaintiffs didn't have any expert on this point. And they did not challenge this point in their opening brief on appeal. I submit that the court's finding is quite clearly not clearly erroneous, but it was amply supported by Dr. Harvey's testimony on this point, and that the project did, as it was intended, actually improve things, but certainly did not cause any flooding on these three plaintiffs' properties. Can you go more into the case? I'll tell you about it. We're having a discussion. Here, it seems that everybody agrees there's more flooding now than there was before. And I realize that someone said there's more rainfall, but over this entire period, after the river was changed, I didn't see anything in the record that there was some significant change, climate change. And so if we accept that as not having been established, there was a climate change in this area. And everybody agrees that there's more flooding. And the only thing different is that the course of the river was changed. There is, and everyone agrees that there's some sort of relationship. Because where does it leave... Your Honor, Dr. Harvey did testify that whatever increased flooding the plaintiffs were experiencing was not caused by the project, but was in all likelihood caused simply by more rain during those years. I don't know what has happened in the years since he did his study, because the trial was, when it was, the experts' reports were when they were. But in the period directly following the raising of Pool 3, it simply rained more. That's what Dr. Harvey testified to. That's what the court found, as a matter of fact. Is there rain-kill data in the record? I believe it's in Dr. Harvey's report. I don't recall. It's also worth remembering, though, Your Honor, that the burden is on the plaintiff to show a taking. They did not present an expert. The trial court found for the government as a matter of fact, and it's not clearly erroneous. This is in the government's defense. It said, no, it just rained more. Never mind what was in June. So don't they have to show it? The government's defense, Your Honor, is that the plaintiffs did not prove that the project caused any flooding on their property. And, in fact, the appellants didn't even discuss this point in their opening brief. It is clearly waived. Even if they had discussed it, they didn't come close to showing that the finding was clearly erroneous. That's the case. In June, we had all this flooding. What are you saying? That they didn't raise the issue for the change in the level of the river that caused the flooding? Your Honor, they didn't put on any evidence in the trial court to prove that it was. And I'd really like to move on to the second, third, and fourth claims, which concern groundwater. Because, again, I think Mr. Cruz has misstated some important points. The trial court... Are you saying that they waived the right to claim the change in the level of the river that caused the flooding? Your Honor, they entirely waived that point on appeal. Yes, they did not raise it in their opening brief. They didn't come close to showing that the trial court's factual finding was clearly erroneous. The issue was waived. But even if it weren't waived, the trial court's factual finding was amply supported by the only expert testimony on this point. Again, Mr. Cox did not testify about flooding. He testified about groundwater, which is the second claim. And on groundwater, there's actually three different kinds of groundwater claims. The first being the Paces groundwater claim. And on that point, the trial court found, as a matter of fact, again, unaddressed in the appellant's brief on appeal, that groundwater levels at properties more than two miles from the river simply were not changed. And on this point, the government found persuasive the testimony of Deborah Hathaway, who studied more than 5,000 measurements from 24 different U.S. Geological Survey monitoring wells throughout the area, north, south, and throughout the plaintiff's properties, before and after the project, 5,000 measurements and numerous studies of water in this area, again, which the appellants did not address in their brief on appeal, and found that more than two miles from the river, groundwater levels simply did not change as a result of the project. Again, that issue is reviewed for clear error. It is entirely weighed. How many of these plaintiffs are more than two miles from the river? Just the paces are covered by this particular point. Alan Cox, who testified in writing, the trial court found was not particularly probative. The trial court found that the 1965 study that Mr. Cruz mentioned, Mr. Cox actually misinterpreted the contour maps. The geotechnical testing lab report that he mentioned from 1995 actually concluded that it couldn't predict groundwater fluctuations based on short-term observations like the ones in that report, and that's at page 613 of the record. The trial court basically allowed Mr. Cox's testimony in because the final fact was judged, but she did not find his testimony to be probative or reliable. Instead, she credited the testimony of Deborah Hathaway, which was based on numerous data points. Unlike Mr. Cox's testimony, Mr. Cox didn't even know where the plaintiff's properties were located. He didn't know what the elevations of the properties were, so the trial court didn't credit his testimony very much, and again, the Collins didn't address this issue in their opening brief on appeal. The third type of claim he refers to is the Morgans claim, which is groundwater levels less than two miles for the river, and I set out Mr. Engler was a separate claim. On the Morgans claim, the court found, again, as a matter of fact, reviewed for clear error, that groundwater levels rose, but they didn't rise high enough to interfere with surface use of the property, agricultural use. Again, the court found Deborah Hathaway's testimony persuasive. It found the data she presented was absolutely uncontradicted. That finding of fact is reviewed for clear error, and again, the appellants did not address the point in the opening brief. The fourth and final claim is that of Mr. Ingram, which is different from the others. It's related to groundwater, but his claim was that the groundwater rose so as to interfere with his dirt pit mining operation between 77 and 96 feet mean sea level. That was the claim he made. On this point, the court, again, found that Mr. Ingram had not proven his claim. He did not prove that the project interfered with his dirt mine operation, and on this point, the court found persuasive the testimony of Mr. French, whose test borings showed that the project did not cause water to seep into the dirt pit. Notably, Mr. Ingram's expert didn't disagree with anything in Mr. French's report. In fact, in Mr. Ingram's expert's report, he noted that he had done his testing on one day in April 2005, and that water levels, of course, fluctuate seasonally. So, he didn't disagree that whatever he found on that one day in April 2005 was certainly not definitive. He agreed with the government's expert, which is the expert that the court credited. And again, it's reviewed for clear error, and the appellants simply did not address this issue in their opening brief on appeal. My understanding is that before the trial court, certainly there was evidence that the Army Corps of Engineers did this work, and this work had some effect, and everyone recognized it would have some effect. I gather your position is that the question is not whether the work of the Corps of Engineers caused some effect on the surrounding land, but whether the work that was done caused damage in the contested areas beyond the point where there was a condemnation. And that the government's position is that there was a record established by both parties, and the Court of Federal Claims looked at all of this evidence, including the fact that the Corps did work on the Red River, and concluded based on all of these facts that the plaintiffs did not establish their case. That's exactly correct, Your Honor, and the only point I would add is that the opening brief on appeal didn't come close to meeting the standard of review. Thank you very much, Your Honor. May I have a couple of moments? Thank you very much, Your Honor. According to counsel, maybe I made a mistake, but I apologize. I didn't intend to, but I'd like to conclude in that case at all. Common sense will tell you if the pool is raised from 87 foot to 95 foot, 8 foot, you've got more water causing a lot of energy and activity than you had at 87. That's just common sense. Common sense will tell you that water will migrate out further from the river into the soil than if it were 87 foot. Common sense will tell you that Dr. Harvey was wrong when he said water back up in Vauquia couldn't occur. When in truth in fact, after they were shown by eyewitnesses and photographs, it did occur. It occurred when the level of the river was higher than Vauquia. That water backed up. When you add rainfall up north of there, you were at 87 foot. It wouldn't have caused nearly the problems caused after this was raised to 95 foot. That seems to be fundamental in the sound of your understanding, beyond which I have difficulty understanding how the coral condense otherwise. Robert Morgan is right there on the left. I walked over this property and saw for my own eyes with my foot in the mud of what the groundwater seepage does. The coral went down on one of the climbs of the place and stuck to a vehicle from groundwater effect on that land. Regarding the borehole, I ask you to please look at page 4 of the report that was obtained at the request of the Red River Waterway Commission from the General Technical Services. At page 4 of the report, the following appears. Groundwater was observed from the ground surface to a depth of 13 feet. This is talking about the borehole. Where does this appear? That is attached to the deposition of Mr. Cox. Let me state that again. On page 4 of that report, in October 1995, following the raising in January 1995, groundwater was observed from the ground surface to a depth of 13 feet. However, within 24 to 48 hours just now, after exploration, the water level generally rose to within 5 feet of the ground surface. To believe Dr. Mez-Hathaway, you've got to ignore what? The Pettyjohn report predicting this in 1965. You've got to know the GA Technical Services report of October. You've got to ignore the fact that Red River with the Corps of Engineers expected this and concluded there was groundwater. That they came in there and paid these claims before the suit was filed. That they had other groundwater claims including Mr. Ingram's under-negotiation for settlement based on groundwater from the Red River. They bought that land after the suit was filed. That wasn't bought as part of the original plan for this. This was after the suit was filed. The totality of the picture shows that the judge, bless her heart and all due respect, simply took these two experts and virtually ignored the other evidence. But with regards to groundwater, you look at the other evidence and you say, there can be only one weight of evidence that applies here but preponderance. And that clearly shows that Mez-Hathaway was right when she says that groundwater marries up with the river example in time. But beyond that, she's in direct opposition to all of the other stating facts. Mr. French and his report, their expert agreed with Mr. Miller-Hoover's report. Was there any evidence in the record relating to changing weather conditions? Yes sir. You will find that included in the data that was submitted with regards to the change in weather conditions. Where would I find this? In connection with Dr. Cox's report? Dr. Harvey's offering. It's a combined exhibit. I believe you will find it. It's a combined exhibit kind of thing. Yeah, that's probably it right there. You will find it in that data, I believe. But, Your Honor, as you pointed out, I met a dead human. I'm sorry to call you a doctor. A dead human. You were right on both counts. Well, thank goodness I am. Thank goodness I am. These folks, 169 in number, say they were not taken contrary to what the court says. For a loss of lands as a result of raising that pool. The court didn't want to acknowledge that. Red River didn't want to acknowledge that. Because they had screwed up. And you know how they had? Politics made them move Locking Down 4 upstream. Then they found out, although Locking Down 3 was almost finished, we can't maintain the navigation depth of 9 foot. We've got to raise that pool to 95 foot to do that. And they hinged that pool down there. The only one they hinged. And that's when our problem started. Raising depth. If they hadn't come in there and told these folks, we're raising it to 95, let's all look at this thing together, we wouldn't be here today. None of that occurred. But they were trying to when the suit was filed, trying to negotiate settlements. And they had settled some of those cases. We simply asked you that justice really would best be served, Your Honor. To remand this down there and let the trial judge hear the evidence and do a true causation because they have the proof that relates to the things that we've talked about as part of the damage case. The affidavits stand unconfused, Your Honor. Do you have any further questions? Thank you so very much.